**STATE of Missouri, Respondent,**

v.

**Rosario M. OLIVARES, Appellant.**

**No. WD 47087.**

Missouri Court of Appeals,
Western District.

Dec. 28, 1993.

Gerald M. Handley, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., David B. Cosgrove, Asst. Atty. Gen., Jefferson City, for respondent.

Before HANNA, P.J., and LOWENSTEIN and FENNER, JJ.

FENNER, Judge.

Appellant, Rosario M. Olivares, appeals her conviction in the Circuit Court of Jackson County, Missouri, for two counts of possession of a controlled substance with intent

to distribute, deliver, or sell, in violation of section 195.211, RSMo Supp.1992.

Appellant was charged by information and a jury trial took place in June of 1992. Viewed in the light most favorable to the verdict, the evidence at trial showed the following: Detective Sidney Whitfield, an undercover narcotic agent and detective employed by the Jackson County Drug Task Force, testified that on October 9, 1991 at approximately 1:00 p.m., he and Agent Hernandez met with a suspect, identified as Diana Sell, on 89th Street in the parking lot of Chopsticks Restaurant, near Ward Parkway Shopping Center. Sell was accompanied by a Mexican male, identified as Bonda–Acosta.[1] The purpose of the operation was to purchase one pound of marijuana from Sell and contract for another three pounds of marijuana in the hopes that Sell would lead them to her source. According to Detective Whitfield's testimony, this was an ongoing investigation. Sell sold Detective Whitfield one pound of marijuana, which was packaged in a freezer bag, and Detective Whitfield gave Sell $1550.00 in marked bills for the marijuana. When Detective Whitfield asked Sell about buying three more pounds, Sell conferred with Bonda–Acosta and indicated that this could be arranged. At that point, they drove to 1013 West 85th Street where they were followed by several police officers. Detective Whitfield testified that Sell and Bonda–Acosta returned to the parking lot fifteen to twenty minutes later with the three pounds of marijuana. However, they quickly drove off when they saw a police car that was not involved in the operation.

Sell was later arrested and had a fifty dollar bill on her that Detective Whitfield had given her at the buy. On the evening of October 9, 1991, a search warrant was executed at 1013 West 85th Street, the home where appellant resided. Sergeant James K. Bruce of the Jackson County Drug Task Force testified that he supervised the search. Both he and Detective Ray Killion, who was the property officer on the search warrant, testified that appellant stated that all the drugs in the house were hers. During the course of the search, $1650 was found in a nightstand in one of the bedrooms, $1500 of which was the money that Detective Whitfield had given to Sell in the undercover drug deal earlier in the day. In appellant's purse, the officers found $400.00 in cash, a brass cigarette case with three hand-rolled marijuana cigarettes, and ten packets of white and chunky white powder found to be cocaine. Other items found in appellant's residence included ten bags of marijuana in a freezer, a rifle, and a shotgun.

Appellant testified that she had resided at 1013 West 85th Street in Kansas City, Missouri since 1981. She testified that on October 9, 1991, her three children, her sister, and two Mexican males, one of whom was Bonda–Acosta, lived with her in that home. Apparently, appellant and Bonda–Acosta were having a relationship. She suspected that Bonda–Acosta was using drugs because she found cocaine in his coat pocket one day. Appellant testified that she knew Sell from going to school with her and that Sell had a drug problem. Appellant stated that she was not aware of any drugs in her house. She stated that the freezer where marijuana was found was brought in by Bonda–Acosta and the other man living in her house. She claimed to have no knowledge about what was inside the freezer nor any knowledge about any drugs being brought into her home. She stated that the police officers pointed guns at her children and her sister when they drove up to the house during the execution of the search warrant. At that point, she admitted that she said that all the drugs in the house were hers.

During the execution of the search warrant, appellant was placed under arrest because of traffic warrants and was brought to the Raytown Police Department. She was held there for a few hours until she paid off her traffic tickets. While there, she was interviewed by Deputy Harold Thompson. Deputy Thompson talked to appellant about becoming an informant and tried to obtain

1. Bonda–Acosta was referred to by different names during the course of the trial, including Sergio, Acosta, and Bonda–Acosta. It is apparent from the trial transcript that these different names all referred to the same person, who we will refer to only as Bonda–Acosta for purposes of clarity in this opinion.

her cooperation. Appellant was read her Miranda rights and signed a Miranda waiver. Appellant did not offer Deputy Thompson much information other than to say, "she could buy any amount of marijuana as long as she had the money, and she flies to someplace in Texas to purchase it from an unknown male.... [and] she can get [cocaine] from a man who's tried to get her to sell it." Appellant did not provide any further information.

The jury found appellant guilty on June 11, 1992 and assessed punishment at five years imprisonment on Count I, possession of marijuana with intent to distribute, deliver, or sell, and ten years imprisonment on Count II, possession of cocaine with intent to distribute, deliver, or sell. On July 6, 1992, appellant filed a Motion for Judgment of Acquittal or, in the alternative, For a New Trial, which motion was denied. Judgment was entered on November 4, 1992 and appellant was sentenced in accordance with the jury's recommendation, with the sentence imposed in Count II to run concurrently with the sentence imposed in Count I. This appeal followed.

In her first point on appeal, appellant argues that the trial court erred in allowing the State, through the testimony of Detective Whitfield, to introduce to the jury criminal acts of another party, insinuating that appellant was involved in these acts, and hearsay statements of said other party. Appellant specifically complains about Detective Whitfield's testimony as to a sales transaction with Diana Sell that occurred on October 4, 1991, a few days before the transaction that led to the search of appellant's home, and statements made by Sell during this transaction. Appellant further complains that the State was allowed to introduce over objection the bag of marijuana that Detective Whitfield allegedly purchased from Sell on October 4th. Appellant contends that this "other crimes evidence" along with the hearsay statements of Sell, who did not testify at trial, violated appellant's right to a fair trial.

In the case at bar, during pretrial motions, defense counsel moved "for any disclosure of any alleged other-crimes evidence." The State advised that it expected that an officer would testify at trial that on the occasion of an earlier undercover purchase of marijuana from Diana Sell, on October 4, 1991, Sell advised the undercover officers that a Mexican woman was her source for the drugs she was selling. Sell was not to be called as a witness.

The court determined that attempting to repeat the conversation of Diana Sell on October the 4th would be hearsay where Sell was not a witness. The court concluded that this particular line of inquiry would not be permissible.

At trial, the subject of the transaction on October 4th was brought out on cross-examination of Detective Whitfield by defense counsel. The testimony was, in relevant part, as follows:

Q. [defense counsel]: You became involved in this case before October the 9th, correct?

A. [Detective Whitfield]: Correct.

Q.: I think you testified that it was some—something ongoing or something?

A.: Yes.

Q.: Now, on October the 9th at 1:00 when you met Ms. Sell, did that come because you called her or she called you? How did it come you got to together at 1:00 at that particular location?

A.: Okay. The prior deal we had done with her, which was on the 4th, we had told her we would contact her later or she could contact us.

Q.: All right.

A.: That being myself and Agent Hernandez.

Q.: Did she contact you?

A.: We—yeah, the following week.

\* \* \* \* \* \*

Q.: Now, did Ms. Sell tell you that she was bringing with her a Mexican male?

A.: No, sir.

Q.: Were you surprised to see a Mexican male arrive with her in that truck?

A.: Yes.

Q.: When the—when the truck arrived, sir, are you—you and one other person approach the truck?

A.: Yes, sir.

Q.: And you know Ms. Sell, right?

A.: From a previous deal, yes.

During the rest of his cross-examination, defense counsel tried to infer that perhaps Bonda–Acosta was Sell's source.

During the State's redirect examination of Detective Whitfield, the following colloquy occurred:

Q. [prosecuting attorney]: Did [Sell] ever indicate to you in her dealings whether or not [Bonda–Acosta] was her source?

A. [Detective Whitfield]: No, she didn't. First time I ever saw him was at that time [on October the 9th].

Q.: Did she ever indicate anything about her source?

MR. HANDLEY [defense counsel]: Excuse me. Would you come up here?

[Counsel approached the bench, and the following proceedings were had:]

THE COURT: This is the very area we were concerned with.

MR. HANDLEY: I mean, it's an open-ended question.

MS. WILLIAMS: It seems counsel opened it that Mr. Bonda–Acosta was the source, and we have information otherwise.

THE COURT: I don't agree. If you're going to ask this witness what Ms. Sell told him, we're into the very area we talked about earlier.

MS. WILLIAMS: I'll withdraw the question.

THE COURT: Well, I don't—I don't want the record to suggest that I'm foreclosing that inquiry. It's just that I wanted to know what the question's going to be and what the answers are expected to be before I rule on the objection.

MS. WILLIAMS: I had not planned on hearing that area. I had not planned on hearing this area until he had been inferred by the cross-examination that Mr. Acosta was the one that had to give the approval, that he was somehow the source.

Subsequent to the above colloquy, a voir dire was conducted outside the presence of the jury. The State's offer of proof was, in pertinent part, as follows:

Q. [prosecuting attorney]: Detective Whitfield, when you testified earlier, you stated that you had had previous contacts with Diana Sell before October the 9th; is that correct?

A. [Detective Whitfield]: Yes.

Q.: When were those contacts?

A.: It was October the 4th.

Q.: Of 1991?

A.: Of 1991. 1992—19—

Q.: Where did that occur?

A.: It occurred at Kentucky Fried Chicken, I believe 1112 Westport Road.

Q.: What occurred at that time between you and Ms. Sell?

A.: I purchased another one pound of marijuana from her.

Q.: All right. Was anyone with you at that time?

A.: Yes, Special Agent Hernandez.

Q.: How much did you pay for that one pound?

A.: Fifteen hundred fifty dollars.

Q.: Now, at that time did you discuss trying to change the price in any way with her?

A.: Yes, I did.

Q.: And what did she state to them?

A.: She said she would ask, but she didn't know. So—about the lower price for the marijuana. But that's all she said. She would ask to see if she could get a better price, but she didn't know whether she could or not.

Q.: She indicated she had to ask someone else?

A.: Yes.

Q.: Did she indicate whether that person was male or female?

A.: Female.

\* \* \* \* \* \*

Q.: Was there anything from that conversation that you had with her that day that prompted you to set up the meeting on October the 9th?

A.: Yes.

Q.: And what was that?

A.: We told her we'd probably want some more, and she said, well, she'd have to check with a Mexican lady who goes down every once in a while and brings back eight or ten pounds to sell in the Kansas City area.

Q.: And where did you decide to make this next connection?

A.: Okay. We decided to call her and set up the connection. She suggested we do it at the Ward Parkway Shopping Center because that was close to where she lived, and we agreed.

Q.: Okay.

After hearing the State's offer of proof, the court sustained defense counsel's objection to the line of inquiry concerning the testimony by Detective Whitfield as to what he was told by Ms. Sell, who was not a witness in the case, regarding her drug source.

The State resumed its redirect examination of Detective Whitfield, in the jury's presence, as follows:

Q.: Detective Whitfield, on cross-examination by Mr. Handley you stated that you knew Diana Sell when she approached you on October the 4th; is that correct?

A.: On the 4th?

Q.: On October the 9th, I'm sorry.

A.: Yes.

Q.: How did you know her?

A.: From a previous deal.

Q.: When was that?

A.: That was on the 4th, I believe it was.

Q.: And where did that take place?

A.: That took place at Kentucky Fried Chicken.

Q.: And what happened while you were at Kentucky Fried Chicken?

MR. HANDLEY: Object to the form question as calling for a narrative answer.

THE COURT: Sustained.

The State continued its questioning about the actual sale of marijuana on October the 4th, and then Detective Whitfield identified State's Exhibit Number 60 as the one pound bag of marijuana that he purchased from Sell on October the 4th. Defense counsel then objected to the line of inquiry regarding the sale that took place on October the 4th. The court found that any objection to the testimony concerning the actual transaction on October the 4th was untimely, but went on to consider the objection as to the admission of Exhibit Number 60. The court received Exhibit Number 60 into evidence as relevant to showing similarity in packaging. Detective Whitfield's testimony indicated that the packaging of the one pound bag that he bought on October the 4th was the same as the packaging of the bag bought on October the 9th and the bags found in appellant's home on October the 9th.

■ Appellant argues under his first point that the court improperly allowed testimony in regard to the October 4th transaction. However, since appellant failed to object to the testimony relating to the October 4th transaction at the earliest opportunity, she waived her right to complain on appeal. *Chism v. Steffens,* 797 S.W.2d 553, 559 (Mo. App.1990). As noted above, no objection was made until after the entire line of inquiry in regard to the October 4th transaction was completed except for the actual offer of Exhibit Number 60.

■ A trial judge has wide latitude in ruling on whether to admit or exclude evidence adduced by the parties at trial. *State v. Clark,* 711 S.W.2d 928, 932 (Mo.App.1986). The trial judge has discretion to determine the materiality and relevancy of evidence offered. *Id.* Absent clear abuse, an appellate court will not interfere with the trial court's ruling on the admission or exclusion of evidence. *Id.*

■ Evidence of uncharged crimes is usually inadmissible unless it is logically and legally relevant to establish a defendant's guilt in the crimes charged. *State v. Bernard,* 849 S.W.2d 10, 13 (Mo. banc 1993). Evidence is logically relevant if it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial. *Id.* (citation omitted). Evidence is legally relevant if its probative value outweighs its prejudicial effect. *Id.* (citation

omitted). The balancing of the effect and value of evidence rests within the sound discretion of the trial court. *Id.* (citation omitted).

■ Generally, evidence of other, uncharged misconduct has a legitimate tendency to prove the specific crime charged when it tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial. *Id.* (citation omitted).

■ In the case at bar, the State was required to prove that appellant possessed the drugs found at her home with the intent to distribute, deliver or sell the drugs. The fact that the October 4th and October 9th transactions were part of the same ongoing investigation, the drugs represented by Exhibit 60 were of the same variety as those found at appellant's house, were packaged the same as both the marijuana sold to Detective Whitfield on October 9th and the bags found at appellant's house, and were distributed through the same intermediary just five days prior to the transaction on October 9th, established the relevancy of Exhibit Number 60 to show appellant's intent to distribute the drugs in her possession.

The transactions on October 4th and 9th were logically relevant to establish that appellant was the supplier and that it was her intention to distribute the drugs located at her home. Evidence of the October 4th transaction was admitted without timely objection, and the trial court did not abuse its discretion in determining that the probative value of Exhibit Number 60 outweighed its prejudicial effect.

Appellant argues finally under her first point that the statements that Sell allegedly made to Detective Whitfield during the transaction on October the 4th, identifying appellant as her source, were inadmissible hearsay. Even though an agreement was reached prior to trial that the State would not elicit such testimony, appellant contends that once trial began, the State "intentionally

attempted to introduce this precise testimony."

Contrary to appellant's assertion, the State did not question Detective Whitfield about Sell's statements about her source when the State resumed its redirect examination after the voir dire. The State merely asked about the actual sale, *i.e.*, where it took place, when it took place, the amount purchased, and the amount paid. The State then asked Detective Whitfield to identify Exhibit Number 60, and asked questions about this exhibit. The State did not continue to ask about the identity of Sell's source after the court ruled that this line of inquiry was impermissible, following the State's voir dire of Detective Whitfield. Thus, there were no statements admitted into evidence about what Sell told Detective Whitfield with regard to her source. Appellant's hearsay argument is without merit.

Appellant's first point is denied.

In her second point on appeal, appellant argues that the trial court erred in failing to declare a mistrial when the prosecutor persisted in following a line of prejudicial questioning after being directed by the court not to do so. Specifically, appellant argues that the expert testimony of Detective Samuel Burroughs as to his identification of appellant's residence as a "drug house" based on the evidence he reviewed, was prejudicial.

In her brief, appellant contends:

The Appellant was prejudiced by the State's incorrect use of their hypothetical to Det. Sam Burroughs. The prosecutor was attempting to develop a hypothetical with this witness about the characteristics of a "drug house", but he continually made specific references to the house at 1015 W. 85th [sic]. At one point he even laid pictures of the Appellant's house on the witness stand and attempted to ask the witness if this house didn't look like a drug house. (T.Tr. 271)

Defense counsel objected frequently and those objections were sustained by the Court. (T.Tr. 271–174) [sic] However, the prosecutor persisted in asking these same questions repetitively. The Appellant was prejudiced by this.

The relevant colloquy between the State and Detective Burroughs is as follows:

Q. [prosecuting attorney]: What else would be found besides those types of denominations of dollars? What else would be found, say, in a search warrant executed on a suspected drug house?

MR. HANDLEY [defense counsel]: Real speculative, and I object.

THE COURT: Sustained.

Q.: Would a gun be found in a drug house?

A. [Detective Burroughs]: Most of the time we would fine [sic] a weapon, yes.

Q.: Would scales be found?

A.: Yes, there would be scales.

\* \* \* \* \* \*

Q.: Let me show you 34, 33, 32, 35, 20, 15. I'd ask you to look at those exhibits, those pictures, and describe to the jury what each of those exhibits depict.

MR. HANDLEY: Well, they're already in evidence, your Honor. I would object, repetitive.

Q.: I'll withdraw that and ask you to look at those pictures, Detective Burroughs, and tell me, based on your expert opinion in narcotics—if I were to tell you that those things are pictures of things that were found at 1013 West 85th Street, what would be your opinion of that house?

MR. HANDLEY: Well, excuse me. Do you want to come up?

[Counsel approached the bench, and the following proceedings were had:]

MR. COLEMAN [prosecuting attorney]: I'm asking for his expert opinion.

MR. HANDLEY: I know. I'm objecting. I'm objecting to the form of the question, your Honor. I mean, I think—I think I know the answer that he's seeking here. However, I don't think that there's an adequate foundation to say, "Look at these pictures. They show drugs and weapons. What kind of a house is it?"

It's undisputed that there was a family living here. I mean, I don't know that that calls from an expert conclusion or that's within the realm of expert testimony.

So my objection is that it's not within the realm of expert testimony.

MR. COLEMAN: I believe it's within the realm of expert testimony.

THE COURT: Just, Mr. Coleman, it is unartfully phrased. I was assuming all along you were going pose [sic] a hypothetical question to the witness. The question, with the way you're presenting it the defense has no opportunity to object on the basis that the hypothetical question, on meeting any essential elements or is overbroad or whatever.

MR. COLEMAN: All right. Then what if I rephrase?

THE COURT: You can—

MS. WILLIAMS [prosecuting attorney]: If I rephrase based on if those things were found in the house?

THE COURT: I'm not—I've said enough already. I don't want to pose the question for you.

MR. COLEMAN: Okay.

THE COURT: So the objection to that extent is sustained.

[The proceedings returned to open court.]

Q.: Let me rephrase the question, Detective Burroughs. Hypothetically, if those items that you just saw were found in a house, what would be your conclusion as an expert?

MR. HANDLEY: I would again object, your Honor, as an improper hypothetical.

THE COURT: Sustained.

Q.: What, in your opinion, do those pictures depict?

MR. HANDLEY: Same objection, your Honor.

THE COURT: Sustained.

MR. HANDLEY: Also relevance.

THE COURT: Sustained.

Q.: Based on those pictures, what you see in those pictures, would that be something that is relevant or pertinent to an environment where drug activity is taking place?

MR. HANDLEY: Excuse me. Same objection, your Honor.

THE COURT: Same ruling.

130

MR. COLEMAN: I'll withdraw the question, and that's all the questions I have.

 It is evident from the above colloquy that appellant received all of the relief requested, i.e., her objection was sustained. Where the trial court grants the defendant all the relief that she seeks, nothing is preserved for appellate review. *State v. White*, 782 S.W.2d 461, 465 (Mo.App.1990). If the more drastic remedy of a mistrial were warranted, then it was up to defense counsel to request that relief. *Id.* The adequacy of the corrective action taken by the trial court is assumed. *Id.; State v. Mitchell*, 751 S.W.2d 65, 67 (Mo.App.1988). When a defendant has received the relief that she sought, she cannot claim error on appeal. *Mitchell*, 751 S.W.2d at 67.

 The trial court did not abuse its discretion in failing to declare a mistrial when no such relief was requested. Moreover, even if a mistrial were requested, this drastic remedy would not have been warranted based on the above line of inquiry.

Appellant's second point is denied.

In her third point on appeal, appellant argues that she was denied a fair trial when, during closing argument, the prosecutor informed the jury that they did not have to find each element of the crime beyond a reasonable doubt in order to find appellant guilty.

In the prosecuting attorney's closing argument, the following colloquy occurred:

MR. COLEMAN [prosecutor]: ... [Appellant] doesn't care about her kids. She doesn't care about her kids. Because if she cared about her kids, they wouldn't be living in the environment that they were living in. We don't have to prove each and every element beyond a reasonable doubt.

MR. HANDLEY [defense counsel]: I object to that, your Honor.

MR. COLEMAN: We have enough.

MR. HANDLEY: They do have to prove each and every element beyond a reasonable doubt. That's the law.

THE COURT: Objection sustained.

MR. COLEMAN: We do not have to prove everything beyond all doubt. We have proven the elements of possession of marijuana and cocaine with the intention to sell, deliver or distribute by the evidence presented, the surveillance of the case that was done, connecting the dope that was found in the truck with the dope that was found in the house controlled by Ms. Olivares....

It is evident from the above colloquy that appellant's counsel objected to the prosecuting attorney's remark and that this objection was sustained. In her brief, appellant acknowledges that her counsel's objection was sustained by the trial court, but argues that "these were insufficient to undo the damage done" and that a mistrial should have been declared. However, counsel for appellant did not request a mistrial or any other relief at trial.

As stated in point two above, where the trial court grants the defendant all the relief that she seeks, nothing is preserved for appellate review. *State v. White*, 782 S.W.2d 461, 465 (Mo.App.1990). If the more drastic remedy of a mistrial were warranted, then it was up to defense counsel to request that relief. *Id.* The adequacy of the corrective action taken by the trial court is assumed. *Id.; State v. Mitchell*, 751 S.W.2d 65, 67 (Mo.App.1988). When a defendant has received the relief that she sought, she cannot claim error on appeal. *Mitchell*, 751 S.W.2d at 67.

The trial court did not abuse its discretion in failing to declare a mistrial when no such relief was requested.

Appellant's third point is denied.

In her final point on appeal, appellant argues that there was insufficient evidence to sustain her conviction on Counts I and II. She contends that "[t]he State's case hinged merely on circumstantial evidence." [2]

 In determining whether or not there is evidence sufficient to support a find-

2. Appellant, in her brief, relies on the circumstantial evidence rule which states that when a conviction rests wholly on circumstantial evidence, the facts and circumstances to establish guilt must be consistent with each other, consistent with the guilt of the defendant, and inconsistent with any reasonable theory of innocence. Such evidence "must point so clearly and satis-

ing of guilt, this court accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and all contrary evidence and inferences are ignored. *State v. Sladek,* 835 S.W.2d 308, 310 (Mo. banc 1992). We will not weigh the evidence or determine the reliability or credibility of witnesses. *State v. Hamilton,* 817 S.W.2d 8, 11 (Mo.App.1991). Our review is limited to a determination of whether there is sufficient evidence from which the jury could have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989).

■■■ As set forth at the beginning of this opinion, the evidence shows that after making the sale of one pound of marijuana on October 9, 1991, Sell and Bonda–Acosta drove to appellant's residence to obtain the three pounds of marijuana that the undercover officers had requested. When the search warrant was executed at appellant's residence on the evening of October the 9th, appellant stated that all of the drugs in the house were hers. The evidence at trial also showed that the packaging of the marijuana sold to Detective Whitfield on October 4th and October 9th was similar to the packaging of the marijuana found in appellant's home. Furthermore, the cash used in the drug transaction on October the 9th was found in appellant's home during the execution of the search warrant. Drugs and cash were found in appellant's purse.

We find that the evidence was more than merely circumstantial and was sufficient to support appellant's conviction on Counts I and II.

Judgment affirmed.

All concur.

factorily to guilt as to exclude every reasonable hypothesis of innocence." For this proposition, appellant cites to *State v. Aguilar,* 429 S.W.2d 754, 756 (Mo.1968).

Appellant's reliance on the circumstantial evidence rule is misplaced, as this rule has recently been rejected by the Missouri Supreme Court in *State v. Grim,* 854 S.W.2d 403 (Mo. banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Nonetheless, we find that the evidence in the case at bar was more than merely circumstantial.