**STATE of Missouri, Plaintiff/Respondent,**

v.

**Martin LINK, Defendant/Appellant.**

**Martin LINK, Movant/Appellant,**

v.

**STATE of Missouri,
Respondent/Respondent.**

Nos. 65065, 67448.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 23, 1996.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 1996.

Deborah B. Wafer, District Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Cheryl A. Caponegro, Assistant Attorney General, Jefferson City, for respondent.

REINHARD, Presiding Judge.

A twelve count indictment was returned against defendant on September 26, 1991. An amended information in lieu of indictment was later filed which restated the twelve counts and also alleged defendant to be a prior offender and dangerous offender pursuant to § 558.016, RSMO Supp.1992, and a prior offender pursuant to § 558.019, RSMo Supp.1992. Counts V through XI concerned defendant's criminal acts regarding one victim, and those counts were tried separately. They are: Count V—attempted forcible rape, § 566.030, RSMo Supp.1990, Count VI—sodomy, § 566.060, RSMo Supp.1990, Count VII—first degree robbery, § 569.020, RSMo 1986, Count VIII—kidnapping, § 565.110, RSMo 1986, and Counts IX, X, and XI— armed criminal action, § 571.015, RSMo 1986 (respectively related to Counts V, VI and VIII).

The jury returned guilty verdicts on all relevant counts. Defendant was sentenced by the court to terms of life imprisonment on Counts V, VI, and VII, and thirty year terms each on Counts VIII through XI. Count V was to run consecutively to previously imposed sentences (identified by the court as county case No. 91CR–488 and federal case 83–93CR). The remaining counts were ordered to run consecutively to each and every numerically preceding sentence and also ordered to run consecutively to the federal and county sentences.

Defendant appeals from the judgment entered on the above convictions and also appeals the motion court's denial, after an evidentiary hearing, of his Rule 29.15 motion for post-conviction relief.[1] We affirm.

The evidence reveals that on January 23, 1991, victim drove to the Itaska Laundromat in St. Louis in order to do her laundry,

arriving at approximately 8:00 p.m. She stated that she had selected the Itaska Laundromat because she knew it had a surveillance camera which she believed was watched by the person living above the laundry. The laundromat was empty when she arrived. At approximately 9:00 p.m. she observed a man (defendant) enter the laundromat. Victim testified defendant was clad in jeans, a flannel shirt, tennis shoes and a black hat with "some sort of satanic symbol" on it. Victim "continued to fold my clothes and, as he rounded the washers, I heard him getting closer, so I turned around to look and he was right there, pulling a knife out." Defendant swiped victim's eyeglasses off her face, and threw her to the floor. Defendant ordered victim to take off her pants and shoes, and she complied. Defendant then, "forced me onto the floor and took his jeans down to his knees and knelt in front of me and instructed me to do oral sex on him." After approximately a minute of oral sex, defendant then "pushed me down to lay on the floor, and he tried to put his penis inside of my vagina." Defendant failed in the insertion of his penis into victim's vagina, and forced her to perform oral sex once more. He then pushed her down again and this time was able to insert his penis into her vagina. Defendant told victim to "get a good look at his face." Subsequently, he pulled victim to her feet and said, "We're leaving." He ordered her to get dressed and told her to put her arms around him as if they were a couple. He put the knife to her side and told her, "If you scream, I'll cut you." They walked to defendant's car, a gray Ford Tempo with a red interior, and defendant opened the driver's side door and pushed her in. She crawled to the passenger's seat and in the process of sitting up, she was able to unlock the passenger's side door.

Still holding the knife, defendant instructed victim to give him all of her money. She gave him three dollars in quarters and her house key. Her purse was thrown into the back seat. Defendant ordered her to again undress and she complied, keeping on only

---

1. Defendant has failed to address any points in this appeal to the denial of his Rule 29.15 motion. That appeal is therefore considered abandoned. *See State v. Nelson,* 818 S.W.2d 285, 287 (Mo.App.1991).

her sweatshirt. Defendant then placed his knife blade on victim's knee and drove off. At a four-way stop, victim leapt from the car just as defendant started to accelerate through the intersection. Defendant drove off down Virginia Avenue toward Interstate 55. Victim sought and gained help from a couple who drove her home. There, victim called the police who arrived shortly thereafter. Victim was subsequently taken to a hospital where a "sexual assault kit" was prepared.[2]

A number of police officers testified regarding the course of the investigation. Based on their interview with victim, an all-points-bulletin was put out for a very light-complected black male in his late twenties/early thirties, driving a gray Ford Tempo. Officer Henry Keeler, then assigned to the "Sex Crimes/Child Abuse Section" of the St. Louis Metropolitan Police Department, testified that he found victim's eyeglasses and her abandoned laundry at the laundromat. David Urg, an evidence technician searched the laundromat for fingerprints and testified that he found a fingerprint on the exterior of the right side of victim's eyeglasses. John Vogan, a St. Louis police officer assigned to the identification division, testified that the fingerprint on victim's eyeglasses was that of defendant's left middle finger.

On January 24, 1991, victim selected defendant's photograph from a five man police photo line-up. On January 26, 1991, defendant was arrested while driving a gray Ford Tempo by Officer Chris Nagel of the City of Kirkwood Police Department. His search of the vehicle revealed a knife and a black hat with a picture of the Grim Reaper and the words "Grave Diggers". Victim later identified the car as the one defendant had forced her into and also identified the hat and the knife as that, respectively, worn and used by defendant at the crime. A few days later, victim identified defendant in a live police line-up.[3]

On appeal, defendant first contends that the trial court erred:

... in overruling [his] objection and permitting the state to adduce evidence from [victim] that she went to the laundromat [on Itaska and Alaska] because there was a surveillance camera there and she thought it would be watched.... This evidence was irrelevant in that it was not probative of the charges being tried and was presented for the sole purpose of engendering sympathy for the [victim]. The evidence was prejudicial in that it tended to distract the jury's attention from the true issues and to encourage them to find [defendant] guilty based on their sympathy for a woman who thought she was in a supposedly "safe" laundromat being attacked.

▮ The trial court has broad discretion in determining the relevancy of evidence. *State v. Henderson,* 826 S.W.2d 371, 374 (Mo.App.1992). Evidence is considered to be relevant if it logically tends to prove or disprove a fact in issue or to corroborate evidence which itself is relevant and bears upon the principal issue of the case. *State v. Hill,* 817 S.W.2d 584, 587 (Mo.App.1991). Defendant is required to show error in the reception of evidence and prejudice resulting therefrom. *State v. Starke,* 811 S.W.2d 799, 801 (Mo.App.1991). Here, irrespective of the relevance of the testimony, there was simply no possible prejudice. Evidence of guilt was strong and the judge, not the jury, assessed punishment. *See State v. Stevenson,* 852 S.W.2d 858, 863 (Mo.App.S.D.1993). Further, the nature of the question and response

2. Victim was called a few days later by a man who told her he had found her phone book and some pictures on Virginia Avenue. Her wallet was discovered by two teens along the Meramec River in August of 1992. The wallet still contained victim's drivers license and some credit cards.

3. Defendant did not testify or call witnesses. He did, however, introduce a birth certificate which listed his parents as being white. In closing argument defendant essentially conceded the offenses occurred, but argued mis-identification. We note that victim never wavered in her identification of defendant. She selected him from a photo line-up, a live line-up and identified him at trial. It has been said that no other crime focuses a female victim's attention on her assailant as intensively as rape. *State v. Trimble,* 654 S.W.2d 245, 254 (Mo.App.1983). Here, victim had ample opportunity to view defendant, and we note that defendant even ordered her to look at his face.

was the sort to which the jury would attach little significance.

■ Defendant next asserts the trial court erred:

> ... in overruling [his] objections and permitting the prosecutor during closing argument to state that [defendant] was a "predator" who "cruises around the streets ... look[ing] for people" and to ask the jury to consider why [defendant] would want to keep victim's "house key".…

Defendant asserts that the reference to him being a street-cruising predator looking for other victims was highly prejudicial because it suggested the prosecution's knowledge of defendant's commission of similar offenses in the past and the "implicit suggestion" that defendant intended to commit such offenses in the future. In *State v. White*, 733 S.W.2d 57, 61 (Mo.App.1987), the prosecutor stated without objection during closing argument "that the defendant was like 'a predator,' 'a bug' and a 'person preying on the poor.'" We stated:

> Trial courts are vested with broad discretion in controlling closing arguments in criminal cases and the general rule is that attorneys are accorded a broad latitude in their summations. A conviction will be reversed for improper argument only if it is established the complained of comments had a decisive effect on the jury's determination.
>
> \* \* \* \* \* \*
>
> We do not condone the application of denunciatory epithets to a defendant. However, a new trial is not called for in every instance where a prosecutor uses an unbecoming name in characterizing the defendant.

*Id.* at 61 (citations and internal quotations omitted).

Whatever the propriety of the prosecutor's characterizations, there was simply no possibility of a decisive effect on the jury. *See*

*generally Stevenson, supra.* This lack of the possibility of prejudice also relates to the other portion of closing argument identified by defendant as improper.[4] Moreover, after the defendant's objection to the state's "house key" question, the court directed the state "not to pursue that particular line of argument." Defendant requested no other relief. *See State v. Olivares*, 868 S.W.2d 122, 129 (Mo.App.W.D.1993).

We affirm.

KAROHL and DOWD, JJ., concur.

4. The prosecutor stated:
   They found her wallet in the river and found some of her ID on the street. We didn't find the money and we didn't find the [house]key so he kept—incidentally, what did he want her house key for?

Defendant argues that there was no evidence that defendant kept victim's house key, and that the question was designed to make the jury infer defendant "had future designs on either burglarizing [victim's] house or perhaps committing additional offenses against her there."