STATE of Missouri, Respondent,

v.

**Mark WOODWORTH, Appellant.**

**No. WD 51103.**

Missouri Court of Appeals, Western District.

Feb. 25, 1997.

Motion for Rehearing and/or Transfer to Supreme Court Denied April 1, 1997.

Application to Transfer Denied April 29, 1997.

Reversed and remanded for new trial.

James R. Wyrsch, Wyrsch, Atwell, Miraki-an, Lee & Hobbs, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Jefferson City, Philip M. Koppe, Assistant Attorney General, Kansas City, for respondent.

Before ELLIS, P.J., and LOWENSTEIN and LAURA DENVIR STITH, JJ.

LAURA DENVIR STITH, Judge.

Mark Woodworth appeals his convictions by a jury of the murder of Catherine Robertson, assault in the first degree on her hus-

band, Lyndel Robertson, burglary and two counts of armed criminal action. He was sentenced, respectively, to consecutive terms of 10, 5, 10, 3, and 3 years imprisonment.

We reject defendant's contention that the prosecution failed to make a submissible case because it could show only that his fingerprint was on a box of shells which may have been used in the crime, but could not show that the fingerprint was not placed on the shell box at a time other than the time of the murder. We find that the question of when the print was placed on the box of ammunition was a jury question, and that the fingerprint evidence, when combined with the other evidence in the case, made a weak but submissible case against defendant.

We remand for a new trial, however, because of error by the trial court in excluding evidence that another person had motive and opportunity to commit the crime. This evidence was admissible as substantive evidence because there was direct evidence linking that individual to the crime in that Mr. Robertson stated prior to trial that this was the one who had shot him. While at trial Mr. Robertson denied making the earlier identification, his prior inconsistent statements were admissible as substantive evidence on this point and provided an adequate foundation for admission of the other evidence allegedly inculpating the other individual. We reject defendant's other claims of error in regard to the indictment, the instructions, argument of counsel, and admission of evidence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At about midnight on November 13, 1990, Lyndel and Catherine Robertson were shot while in bed at their home outside of Chillicothe, Missouri. Mrs. Robertson was shot once in the neck and once in the chest. Mr. Robertson was shot three times in the face and once in the right shoulder. The couple was discovered shortly after midnight by their youngest daughter, Roxanne, who found her mother lying still in the bed and her father on the floor throwing up blood. Roxanne woke up her older sister Rhonda who immediately ran to her parents' room where she found her father lying on the floor

near the bed. Her mother was lying in the bed covered with blood. Rhonda dialed 911 and gathered her three siblings together in the living room.

When the paramedics arrived, they found Mrs. Robertson lying dead in the bed with blood on the walls and the sheets. A subsequent autopsy revealed that Mrs. Robertson died from two small caliber gunshots to her head and chest. Mr. Robertson was found lying on the floor groaning. He spit out a bullet fragment which was turned over to the Livingston County coroner. Broken teeth and a bullet fragment were also found in the bed. Mr. Robertson was taken to the hospital where another bullet fragment was extracted from his tongue. One of the bullets had entered Mr. Robertson's left ear, passed through his shoulder, punctured his lung, and lodged near his liver. That bullet was later removed and turned over to ballistics experts.

A sheriff's deputy, who arrived at the scene soon after the paramedics, found no signs of forced entry. The house had not been ransacked, and money was lying out in the open in the living room.

Two or three hours after the shooting, the county coroner and prosecuting attorney went to the house of Claude Woodworth, who lived about one-eighth mile from the Robertsons and who was in a farming partnership with them. Claude Woodworth's son, Mark Woodworth, was sixteen years old at the time of the shooting and lived at home with his parents and siblings. He was described at trial as being "slow in school." He was able to work for the partnership farming operation, but was generally not paid for his services. To avoid confusion, at times we will refer to the father as "Claude" and to the defendant, his son, as "Mark."

The Woodworths told investigators that Mr. Robertson kept a .22 caliber Ruger pistol in his pickup truck, and that the Robertson gun was identical to one they owned. Claude Woodworth went to his bedroom and retrieved his pistol to show to the coroner and prosecutor. They examined the weapon and returned it to Claude. Mark Woodworth knew where his father's pistol was kept and

sometimes used it for target practice. He and many others involved in the farming operation also were aware of the presence of Mr. Robertson's .22 in the Robertson truck. They had used Mr. Robertson's .22 for target practice on a number of occasions, including one occasion a few weeks before the shooting. They were aware that Mr. Robertson kept .22 shells in a box in his truck. Mr. Robertson also kept boxes of .22 shells under a cigar box on a workbench in the machine shed where he parked his truck. The shed was located about 100 yards from the Robertson house.

About twelve hours after the shooting, investigators examined the Robertsons' machine shed. The shed door, which Mr. Robertson had closed the previous night, was open. Three boxes of .22 caliber ammunition were found in the open on top of the workbench. Several bullets were missing from a box of high velocity .22 caliber long rifle bullets. Investigators dusted the box for fingerprints and found a clear thumbprint on it.

There is evidence that while in the hospital Mr. Robertson told a number of people, including his friends John Quinn, Tom Woodworth, Claude Woodworth, Marvin Meusick, Joe Neal Williams and John Williams, as well as his physician Dr. Fraser, police officer Jim Lightner and others, that a former boyfriend of his daughter named Brandon Thomure was his assailant or that he had seen Brandon assault him. It is alleged that Mr. Thomure had physically abused the Robertsons' daughter Rochelle, that Rochelle had been impregnated by Mr. Thomure, that Rochelle had terminated that pregnancy, and that not long before the shooting Mr. and Mrs. Robertson had offered to buy Rochelle a new car if she would break up with Mr. Thomure. A witness said that he had seen a strange car in the Robertson's driveway on the night of the shooting. The day after the shooting, the police examined Mr. Thomure and found evidence of gunpowder residue on his hands.

Three days after the shooting, two police officers arrived at the Woodworth house and asked if they could conduct ballistics tests on Claude's .22 caliber Ruger pistol. Claude Woodworth gave the officers the gun. Ballistics tests were conducted on both the Woodworth and Robertson pistols. The tests revealed that the lands and grooves of both pistols were consistent with the recovered bullet fragments. The police returned Claude's pistol on March 25, 1991.

Despite the initial leads and investigative activity, no arrests were made for some 20 months after the shooting. During that period Mr. Robertson became frustrated with the lack of progress and hired a private investigator named Terry Deister. Mr. Deister, joined by Gary Calvert, chief deputy and investigator for the Livingston County Sheriff's Department, went to the Woodworth home on July 4, 1992, while Mr. and Mrs. Woodworth were out of town. They asked Mark Woodworth to accompany them to the Sheriff's office. They advised of his Miranda rights and questioned from 8:10 p.m. until 12:32 a.m. The police took Mark's fingerprints during this interview. They later found his fingerprint matched the print found on the box of .22 caliber shells in the machine shed.

Mark was not arrested. Instead, on July 14, 1992, Deputy Calvert returned to the Woodworth home with a search warrant for Claude Woodworth's pistol, which he seized. In August of 1992, the bullet lodged near Mr. Robertson's liver was removed. Ballistics experts tested this bullet against bullets test fired from Claude's pistol. These experts discovered that Claude's pistol had a manufacturing defect that left a distinct mark on fired bullets. The experts later testified that 150 to 1000 barrels could have been manufactured with that particular defect. Moreover, a forensics examiner found that the bullets recovered from the victims had the same brass wash coating and "swage mark" as the bullets in the Robertson's machine shed. So far as it appears from the record, however, none of the experts tested Mr. Robertson's .22 to see if it also had the distinctive manufacturing defect displayed by Claude Woodworth's gun.

Neither Mark nor anyone else was arrested for the next 9 months. Finally, however, on April 11, 1993, some two and one-half years after the murder, Deputy Calvert and Mr. Deister returned to the Woodworth

home. They once again asked Mark to accompany them to the Sheriff's office. He was again advised of his *Miranda* rights and was questioned for another four hours. He was then allowed to leave.

During this and his prior interview, Mark denied knowing anything about the shooting. He told Deputy Calvert and Deister that he had been in the Robertsons' machine shed a few times but that he had never noticed any .22 shells in the shed, that he had never touched the shells in the shed, and that they would not find his fingerprints or handprints on the shells. He later softened his statements, however, by stating that it was possible that he had picked up shells when in the shed to help Mr. Robertson and simply not noticed what he was touching. He also testified that he and a number of other persons who worked on the farm had gone target shooting using Mr. Robertson's gun and .22 ammunition taken from Mr. Robertson's truck on a number of occasions on which they were using the truck on the farm.

Some 6 months later—some three years after the murder—Mark Woodworth was finally charged by indictment on October 29, 1993 with murder in the second degree, § 565.021;[1] burglary in the first degree, § 569.160; assault in the first degree, § 565.050; and two counts of armed criminal action, § 571.015. Mark went to trial on March 13, 1995. The State presented the evidence noted above. Mark presented alternative explanations for the presence of his print on the ammunition box. Another witness, Mr. Neal Williams, also testified that he, Mark, and others had target shot from Mr. Robertson's truck with his gun and .22 ammunition. Mr. Williams also testified that this ammunition was sometimes moved from the truck to the shed, or from the shed to the truck.

Mark offered evidence concerning Brandon Thomure's relationship with Rochelle Robertson and his possible motive for injuring the Robertsons. That evidence was almost entirely excluded, however, based on the rule that evidence showing that another had a motive and opportunity to commit the crime can be admitted only if the defendant also shows some direct evidence connecting the other with the crime. The court ruled that the gunpowder found on Mr. Thomure did not constitute such evidence. It also ruled that Mr. Robertson's statements identifying Mr. Thomure as the assailant did not constitute direct evidence since at trial Mr. Robertson denied that he had made such statements. The court questioned whether Mr. Robertson would really have had an opportunity to see the shooter. The court believed that due to Mr. Robertson's denial at trial that he had seen the shooter, his prior statements identifying Mr. Thomure were not admissible as substantive evidence, and if made were probably just based on speculation. The jury thus never heard the evidence about Mr. Thomure, and only heard a single reference to Mr. Robertson's prior statement identifying him. It had no opportunity to judge the credibility of the witnesses on this issue.

The jury found defendant guilty on all counts. Defendant timely filed a motion for new trial and motion to reduce sentence. These motions were denied, and the trial court entered a finding that no probable cause existed to pursue a 29.15 motion. On May 18, 1995, defendant was sentenced to consecutive terms totaling 31 years. He presents twelve points on appeal.

## II. SUFFICIENCY OF THE EVIDENCE

■ In his first point, defendant claims the evidence against him was insufficient to establish that he was the person who committed the crime. He claims that his fingerprint could have been placed on the box of .22 ammunition for "innocent or legitimate reasons," that the ballistics evidence was inconclusive, and that the motive evidence was weak or nonexistent. He further contends the State's case depended on impermissible inference stacking.

When reviewing the sufficiency of the evidence supporting a criminal conviction, this Court must view all of the evidence, together with any reasonable inferences that may be drawn therefrom, in the light most favorable to the State and must disregard all evidence

1. All statutory references are to RSMo 1994, unless otherwise noted.

and inferences to the contrary. *State v. Silvey*, 894 S.W.2d 662, 673 (Mo. banc 1995). We neither reweigh the evidence, nor determine the reliability or credibility of witnesses. *State v. Idlebird*, 896 S.W.2d 656, 661 (Mo.App. W.D.1995). Review on appeal is limited to a "determination of whether there was sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Dulany*, 781 S.W.2d 52, 55 (Mo. banc 1989). "Even where the evidence is entirely circumstantial, the evidence is sufficient to support a conviction if the evidence is such that a reasonable juror would be convinced beyond a reasonable doubt of the defendant's guilt." *State v. Bragg*, 867 S.W.2d 284, 290 (Mo.App. W.D.1993) (citing *State v. Grim*, 854 S.W.2d 403, 408 (Mo. banc 1993)).

Defendant concedes that someone murdered Mrs. Robertson and assaulted Mr. Robertson, but attacks the sufficiency of the evidence tying him to the crime. Viewed in the light most favorable to the verdict, as set out *supra* and hereafter as necessary, the evidence presented by the State is sufficient to support his conviction.

▮▮▮▮ Mark first argues the State's evidence of motive and opportunity was "weak and based on contradictory testimony." We agree that the State failed to offer credible evidence of motive. While Mr. Robertson testified that he and the Woodworths had a dispute about reimbursing Mark for some expenses, there is no indication that he or his wife ever expressed or otherwise communicated their displeasure to any of the Woodworths prior to the shooting. Proof of motive is not essential to a conviction, however,

and thus the lack of proof of motive does not affect the validity of the verdict.[2]

The State did present adequate evidence of opportunity, however. The reliability, credibility, and weight of the witnesses' testimony on this issue was for the jury to determine. *State v. Sumowski*, 794 S.W.2d 643, 645 (Mo. banc 1990). This Court must accept the jury's determinations of fact from any conflicting testimony, and the jury's findings are conclusive. *State v. Childers*, 853 S.W.2d 332, 337 (Mo.App.1993). The evidence showed Mark lived one-eighth of a mile away, knew the layout of the Robertsons' home, and knew where his father's gun and the Robertsons' guns were kept. Opportunity was established.

The State also notes that ballistics tests conducted on Claude Woodworth's gun and the bullet removed from Mr. Robertson buttress the State's case. While the State's experts could not rule out the possibility that another gun could have created the same markings found on the recovered bullets, the experts testified that the markings "strongly suggested" Claude's revolver was used and that the probability of another gun making the same marks was "extremely small."[3] While Mark argues that the Robertson gun was identical, he failed to offer evidence that it contained the same unusual markings as were found on his father's gun and on the bullet removed from Mr. Robertson.

▮▮▮▮ Added to the above evidence was the key fact that Mark's fingerprint was found on the box of .22 caliber ammunition from the Robertson's machine shed. Mark does

---

**2.** The State tried to show motive by showing that the year of the shooting, Claude Woodworth talked to Lyndel Robertson about Mark planting soybeans after the wheat was harvested. The idea was that Mark would receive the crop and sell it as his own. From the proceeds, he would pay the cost of seed, chemical and other expenses, and would be entitled to the balance in lieu of compensation for his work for the year. As a result, Mark Woodworth did plant approximately 100 acres of soybeans and they were harvested just a few days before the shooting. The total value of the crop was estimated at about $6000. Lyndel Robertson and his wife were apparently upset about the arrangement or disputed the expenses to be reimbursed. There is no indication that either ever expressed or

otherwise communicated their displeasure to any of the Woodworths before the shooting, however. This evidence thus was irrelevant to motive, and we trust that on retrial the prosecution will not again try to create an improper inference from this evidence that Mark and the Robertsons had a disagreement about crops before the shootings.

**3.** We reject defendant's contention that the inability to conclusively establish that Claude's revolver was the murder weapon should have rendered the ballistics evidence inadmissible. This evidence was certainly probative, relevant, and properly admitted. *See, State v. Stillions*, 689 S.W.2d 96, 99 (Mo.App. E.D.1985).

not deny the fingerprint was his. He argues, however, that the machine shed was not part of the crime scene, and thus the presence of his fingerprint on the box was irrelevant. We cannot agree. The shed was on the Robertson's property, approximately 100 yards from the house. The evidence indicates that Mr. Robertson closed the shed door the evening before the shooting, and that law enforcement officers found the door open the next morning when they were investigating the crime. The boxes of bullets normally maintained under two cigar boxes were on the counter, and one of the boxes was not full, meaning that bullets had been removed from the box. The bullets in that box were consistent with the type of bullets used to shoot the Robertsons.

Based on this evidence, the jury could reasonably infer that the murderer went into the shed, removed the ammunition boxes from their usual storage place, removed some bullets from one of the boxes, and used those bullets to commit the crime. Consequently, under these unique facts, the machine shed may be considered part of the crime scene, notwithstanding its distance from the residence. See State v. Maxie, 513 S.W.2d 338, 343 (Mo.1974), cert. denied, 420 U.S. 930, 95 S.Ct. 1132, 43 L.Ed.2d 402 (1975).

The State argues that the mere presence of the defendant's fingerprints at the scene of the crime was alone sufficient to make a submissible case, citing State v. Leach, 752 S.W.2d 395, 396 (Mo.App. E.D.1988). See also State v. Hill, 693 S.W.2d 151, 155 (Mo. App. E.D.1985).

The Missouri Supreme Court made clear in State v. Grim, 854 S.W.2d 403, 407–408 (Mo. banc), cert. denied, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993), however, that mere presence of fingerprints at the scene is not an adequate basis on which to base liability. The State must also show that the defendant has failed to offer an innocent explanation for the presence of the fingerprint at the scene. As Grim stated:

A fingerprint, by itself, normally proves little more than identify and presence. However, in some cases the circumstances surrounding a print or the peculiar location or nature of the fingerprint provide additional evidence of how, when, or why the person touched the object.

Id. at 412. It is only in such cases that the presence of a fingerprint at the scene provides an adequate basis on which to base a finding of guilt.

The State and the defendant disagree as to whether there was an adequate innocent explanation of the presence of Mark's fingerprint on the box of ammunition in this case. The State argues that, when questioned by police, Mark repeatedly denied knowledge of the ammunition in the machine shed and claimed he had only been in the machine shed "a few times." He went so far as to tell the police they would not find his handprints or fingerprints in the machine shed. In fact, his fingerprint was found on the box at the crime scene.

The State notes that when proven false, exculpatory statements evince a consciousness of guilt. Bragg, 867 S.W.2d at 290 (citing State v. Rodden, 728 S.W.2d 212, 219 (Mo. banc 1987)). The State contends that, by making the aforementioned comments denying he had touched the box in the machine shed, Mark ruled out any reasonable possibility that his fingerprint was put on the ammunition box under circumstances other than at the time of the homicide, and that based on this evidence, the jury could reasonably have inferred that Mark handled the ammunition box on the night of the crime. Maxie, 513 S.W.2d at 343. The State argues this evidence was further bolstered by the testimony of the State's fingerprint expert that the print found on the ammunition box was "very fresh."

We disagree with the State that Mark's statements and trial testimony ruled out any reasonable possibility that his fingerprint was put on the ammunition box under circumstances other than at the time of the homicide. While Mark did repeatedly say at the time he gave the police his statements that he could not recall ever touching or even seeing the ammunition box in the machine shed, he did not categorically deny that he had done so. To the contrary, he testified that he had been in the machine shed a few times every year when working on the farm

with Claude and that it was possible he had picked up the shells when they were on the workbench and moved them out of the way, but simply did not notice them as he did so. Claude himself testified there were times when Mark was in the shed when the shell boxes were left out on the workbench and "anybody that wanted to touch it or look at it or actually take some bullets, they could have done it."

In addition, Mark presented evidence that Mr. Robertson kept some identical shells in a box in his truck and that Mark had used those shells for target shooting a few weeks prior to the murder. A neighbor, Mr. Williams, testified that sometimes boxes of shells were moved from the truck to the shed and back to the truck and that he had seen Mark handle the shells in the truck.

This evidence failed to rule out any reasonable possibility that there was an innocent explanation for his print. It instead simply created a question for the jury whether it believed Mark's explanations or whether it believed that the presence of the clear print on the box indicated that Mark had touched the box on the night of the shooting.

The fact that the presence of Mark's print on the box of shells does not by itself create an inference of consciousness of guilt does not mean that the fingerprint evidence was not relevant or admissible, however. It was. While the State may not have categorically proved that Mark had to have touched the box of shells on the night of the murder, "the mere existence of other possible hypotheses is not enough to remove the case from the jury nor does circumstantial evidence need to demonstrate an impossibility of innocence." *State v. Nash,* 621 S.W.2d 319, 323 (Mo.App. W.D.1981) (citing *State v. Mussman,* 526 S.W.2d 62, 63 (Mo.App. W.D.1975)). It was up to the jury to determine whether they believed Mark had put his fingerprint on the box on an innocent occasion or at the time of the killing.

Mark contends that the above evidence is nonetheless insufficient to connect him to the murder and shooting unless the jury is impermissibly permitted to stack inference on inference. "An inference may not properly arise which is 'dependant for establishment

of one fact upon inference to be drawn from some other fact shown only by inference.'" *State v. Moss,* 622 S.W.2d 292, 296 (Mo.App. E.D.1981) (quoting *State v. Gonzales,* 533 S.W.2d 268, 272 (Mo.App. S.D.1976)). This standard intends to guard against attenuated reasoning based on evidence too remote or uncertain or lacking in probative force. *State v. Bailey,* 645 S.W.2d 211, 214 (Mo. App. W.D.1983). This prohibition does not apply, however, to the drawing of multiple inferences from the same proven facts, so long as each inference is supported thereby. *Id.* "Nor is an inference based in part upon another inference and in part upon proven facts prohibited, because it is a parallel inference provided it is a reasonable conclusion for the jury to deduce." *State v. Alexander,* 581 S.W.2d 389, 391 (Mo.App. E.D.1979).

We cannot agree that the evidence adduced required the jury to pile one inference upon another in order to determine Mark's guilt. From the ballistics evidence, the jury could reasonably infer Claude's revolver was used to shoot the Robertsons. From the evidence that the bullets taken from the machine shed on the night of the attack had similar characteristics to those used in the shooting, the jury could reasonably infer that the stolen bullets were used in the crime. From the presence of Mark's fingerprint on the box of bullets, the jury could infer that Mark had touched the box containing the bullets. While Mark offered reasonable alternative explanations for the presence of his fingerprint on the ammunition box, he admittedly did not ever recall touching the box while it was in the machine shed and the evidence left the question open whether the box had been moved to the shed from the truck before or after Mark target shot with the ammunition in the truck. It was up to the jury to weigh that evidence against the State's hypothesis that the print had been placed on the box the night of the crime.

"To consider and base a verdict on the collective impact of these parallel inferences, each supported by testimonial evidence, is not inference stacking." *Alexander,* 581 S.W.2d at 391. Certainly the State's case was thin, and had we been on the jury we might well have voted to acquit. It may be

that, on retrial, the defendant will be better able to disprove one or more of these inferences. We cannot say on the facts as developed in the trial below, however, that a reasonable juror could not be convinced of Mark's guilt beyond a reasonable doubt. Point denied.

## III. THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN EXCLUDING DEFENDANT'S EVIDENCE THAT ANOTHER PERSON HAD MOTIVE AND OPPORTUNITY TO COMMIT THE MURDER

■ In Point II, defendant contends the trial judge erred in granting the State's motion in limine preventing him from presenting evidence pointing to Brandon Thomure as a possible suspect in the crime. Defendant sought to present testimony from various individuals that Mr. Robertson told them, subsequent to the shooting, that Brandon Thomure was his assailant. Mark also sought to introduce evidence of gunpowder residue found on Mr. Thomure the day after the shooting. In addition, he wanted to present evidence that Mr. Thomure had physically abused the Robertsons' daughter Rochelle, that Rochelle had been impregnated by Mr. Thomure, that Rochelle had terminated that pregnancy, and that Mr. and Mrs. Robertson had offered to buy Rochelle a new car if she would break up with Mr. Thomure.

■ Because of the weakness of the State's case and the lack of motive on the part of Mark to commit the murder, Mark argues that the exclusion of this evidence was prejudicial and requires grant of a new trial. We agree. It is true that trial courts are vested with broad discretion in ruling on questions of relevancy, and an appellate court should not interfere with the trial court's ruling absent a clear abuse of discretion. *State v. Shepherd,* 903 S.W.2d 230, 232 (Mo.App. E.D.1995). It is also true that evidence that another person had an opportunity or motive to commit the crime is not admissible just to cast bare suspicion on another person. *State v. Schaal,* 806 S.W.2d 659, 669 (Mo. banc 1991) (citing *State v. LaRette,* 648 S.W.2d 96, 103 (Mo. banc), *cert. denied,* 464 U.S. 908, 104 S.Ct. 262, 78

L.Ed.2d 246 (1983)), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 976, 117 L.Ed.2d 140 (1995).

■ On the other hand, evidence that another had opportunity or motive is admissible if there is also proof that the other person committed some act directly connecting him with the crime. *State v. Wise,* 879 S.W.2d 494, 510 (Mo. banc 1994), *cert. denied,* 513 U.S. 1093, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995). "The evidence 'must be such proof as directly connects the other person with the corpus delicti, and tends clearly to point out someone besides accused as the guilty person.' " *State v. Donnell,* 862 S.W.2d 445, 450 (Mo.App. W.D.1993).

■ The State argues, and the trial court apparently believed, that Mark had failed to offer such direct proof connecting Mr. Thomure with the corpus delicti. We disagree. Mark offered the testimony of Neal Williams that Mr. Robertson had told him that Thomure was his assailant. Dr. Fraser's medical records also state that Mr. Robertson told the doctor that Mr. Thomure had been his assailant. As the State notes, this evidence was hearsay on the issue whether Mr. Thomure in fact was the assailant. *State v. Shurn,* 866 S.W.2d 447, 457 (Mo. banc 1993). At trial, however, when asked whether he had seen his assailant, Mr. Robertson answered that he had not. Defendant sought to introduce the evidence as prior inconsistent statements of Mr. Robertson. A prior inconsistent statement is not hearsay when offered to show the prior statement was made. Moreover, as noted in *State v. Bowman,* 741 S.W.2d 10 (Mo. banc 1987), *cert. denied,* 488 U.S. 829, 109 S.Ct. 83, 102 L.Ed.2d 60 (1988), pursuant to § 491.074 such prior inconsistent statements are admissible both to impeach inconsistent testimony by the declarant at trial and as substantive evidence. Thus, Mr. Robertson's prior statements implicating Mr. Thomure would be admissible as substantive evidence. Such identification of Mr. Thomure in turn constitutes direct evidence linking Mr. Thomure with the crime, and so would have permitted defendant to introduce other evidence of motive or opportunity on the part of Mr. Thomure to commit the crime.

The State tries to distinguish *Bowman* by noting that it specifically declined to address whether an inconsistent statement could be used as substantive evidence where, as in the case at bar, the witness does not give contrary testimony at trial but instead simply denies recalling that he ever made the out-of-court statement. *Bowman*, 741 S.W.2d at 14, n. 6. The State then notes that in *State v. Oliver*, 775 S.W.2d 308, 310 (Mo.App. E.D. 1989), the Eastern District answered this question by holding that "in a criminal case, the prior inconsistent statements of a witness may not be admitted as substantive evidence when the witness denies at trial having made the [prior] statements." 775 S.W.2d at 310.

The State fails to note that the Eastern District limited *Oliver* in *State v. Jennings*, 815 S.W.2d 434, 443 (Mo.App. E.D.1991). *Jennings* permitted use of the prior statement as substantive evidence, even though the witness denied making it, where the prior statement was recorded and so there was independent verification that it had been made. The Missouri Supreme Court followed the same approach a few years later in *State v. Blankenship*, 830 S.W.2d 1, 12 (Mo. banc 1992), in which it also admitted a videotaped prior inconsistent statement as substantive evidence even thought the declarant denied making the statement.

*Blankenship* also cast considerable doubt on the continued viability of *Oliver*'s exclusion of such prior statements even when they are not taped. It noted that the reason given by *Oliver* and other cases for excluding such statements was concern that the confrontation clause would be violated if the declarant denied ever making the prior statement. It then pointed out that *United States v. Owens*, 484 U.S. 554, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988), held that the confrontation clause does *not* prohibit introduction of prior statements even if the declarant has no recollection that the statement was made, if the declarant is available at trial for cross-examination. In a footnote, *Blankenship* then said:

This aspect of the holding in *Owens* may be inconsistent with *Oliver*. There is no necessity here to decide the viability of the requirement in *Oliver* that the prior statement must be recorded by a reliable means to qualify for admission in evidence where the witness denies making the statement. *Blankenship*, 830 S.W.2d at 12.[4]

Perhaps in response to *Blankenship*'s questioning of *Oliver*, in 1993 the Eastern District appears to have *sub silencio* overruled *Oliver* in *State v. Chandler*, 860 S.W.2d 823 (Mo.App. E.D.1993). In *Chandler* defendant was convicted of assault and tampering in regard to the theft of a car. During direct examination, the state's witness denied that he knew anything about the incident involving the defendant and said he did not recall telling the police that he had been shot at during the incident. He also denied identifying the person that had fired the shots.

Because the declarant denied making the prior statement, and so far as the opinion shows the prior statement was not recorded, under *Oliver* it should not have been admissible as substantive evidence. The Eastern District nonetheless affirmed the trial court's admission of the prior statement both for impeachment *and as substantive evidence*. It did so based on *Bowman* and without even citing to *Oliver*, stating:

> the only necessary foundation for the admission of the statement pursuant to this statute is the inquiry of whether the witness made the statement, and whether the statement is true.

*Chandler*, 860 S.W.2d at 825. The Western District followed the *Chandler* approach in *State v. Patterson*, 826 S.W.2d 38 (Mo.App. W.D.1992). In that case, we approved admission of prior inconsistent statements allegedly given to police by three witnesses even though one of the witnesses denied giving the police any prior statement, stating

> it was not necessary for Gray to admit making the statement because the jury had other evidence that he did. *State v. Belk*, 759 S.W.2d 257 (Mo.App.1988). Nor

---

**4.** As noted, *Oliver*'s concern with admission of prior inconsistent statements was that their admission might violate the defendant's right to confrontation. Since here it is the defendant who seeks to admit the prior inconsistent statement, it is questionable whether the *Oliver* exception would even apply.

was it necessary for Parris to admit that his statement was true.  *Id.; Bowman, supra.*

*Patterson,* 826 S.W.2d at 40.  Nothing in *Patterson* indicates the prior statements were recorded; testimony that the statement had been made apparently was enough.

■ Here, as in *Chandler* and *Patterson,* the prior inconsistent statements should be admitted.  While they were not recorded, they were heard by numerous witnesses, including the doctor, and the latter actually noted the statements in Mr. Robertson's medical records.  This constitutes an adequate foundation to admit them as substantive evidence, as well as for impeachment.

Because these prior statements constituted direct evidence implicating Mr. Thomure, the defendant should have been permitted to introduce other evidence showing opportunity and motive of Mr. Thomure to commit the crimes of which he was accused.  Failure to permit introduction of this evidence was error.  We cannot say that the error did not affect the outcome of the case.  The evidence against Mark, discussed in detail above, was tenuous.  No motive was shown for Mark or anyone else to have committed the crime.  Mark was prevented from introducing evidence of motive and opportunity on the part of another, as well as direct evidence connecting the other person with the crime.  This could well have affected the outcome of the trial.  Reversal and remand for a new trial is therefore required.[5]

Because the other issues raised may arise on remand, we address them below.

## IV.  ADMISSIBILITY OF STATEMENTS MADE AFTER POLYGRAPH TEST

■ In Point III, Mark argues the trial court erred in not sustaining his motion to suppress statements made before and after the administration of a polygraph test outside the presence of counsel.  He claims that while he waived his right to have counsel present during the polygraph test, this waiv-

er did not apply to the questioning before and after he was hooked-up to the machine.  Our review of the trial court's ruling on a motion to suppress is limited to determining whether the evidence was sufficient to sustain the trial court's finding.  *State v. Ficke,* 892 S.W.2d 814, 816 (Mo.App. S.D.1995).  We defer to the trial court in assessing the credibility of witnesses and weighing the evidence.  *Id.*  The facts and reasonable inferences arising therefrom are to be considered favorably to the ruling and contrary evidence and inferences are disregarded.  *Id.*

Both Mark and his counsel consented to the polygraph examination.  Prior to the examination, Mark was again read his *Miranda* warnings and was thereby informed that he could have his attorney present at any time.  He then waived his right to have counsel present at that examination.[6]

■ In *State v. Andrews,* 882 S.W.2d 179 (Mo.App. W.D.1994), we held "a statement given after voluntarily signing a *Miranda* waiver, as part of the preparation to administer a polygraph examination, without other reason to exclude, is admissible at a subsequent trial."  *Id.* at 181.  Similarly, *Ficke* held "post-test" questioning without the presence of counsel was permissible "unless the circumstances changed so seriously that [the defendant's] answers no longer were voluntary, or unless he no longer was making a 'knowing and intelligent relinquishment or abandonment' of his rights."  *Ficke,* 892 S.W.2d at 816 (quoting *Wyrick v. Fields,* 459 U.S. 42, 48, 103 S.Ct. 394, 396, 74 L.Ed.2d 214 (1982)); *See also, State v. Owens,* 759 S.W.2d 73, 75–76 (Mo.App. S.D.1988).  The State was not required to re-advise Mark of his *Miranda* rights before any "post-test" interview.  *Ficke,* 892 S.W.2d at 816–17.  Nothing in the record indicates his answers were no longer voluntary or that he was no longer making a knowing and intelligent relinquishment of his rights.  Point denied.

---

5. Because of our resolution of this issue, we do not reach the other grounds on which defendant argues the prior statements were admissible.

6. Woodworth claims that his attorney only gave permission for questioning while hooked to the machine.  He has cited to nothing in the record that would support this contention.

## V. THE INDICTMENT WAS NOT FA-TALLY DEFECTIVE

In his fourth point, Mark claims his indictment was fatally defective for three different reasons and that the trial court erred in denying both his motion to dismiss the indictment and his motion for new trial. The purpose of an information or indictment is to inform the defendant of the charges against him so that he may prepare an adequate defense and to prevent him from being re-tried on the same charges if acquitted. *State v. Allen*, 905 S.W.2d 874, 879 (Mo. banc 1995). "An information is sufficient when it contains all the essential elements of the particular offense and clearly apprises the defendant of the facts constituting that offense." *State v. Heslop*, 842 S.W.2d 72, 76 (Mo. banc 1992), *cert. denied*, 508 U.S. 921, 113 S.Ct. 2369, 124 L.Ed.2d 275 (1993).

■ Mark first challenges counts II (armed criminal action, § 571.015), III (assault in the first degree, § 565.050), and IV (armed criminal action, § 571.015) claiming that they omit the mental element of the crime charged. "Rule 23.01 governs the form of indictments or informations, and subsection (e) provides that, '[a]ll indictments or informations which are substantially consistent with the forms of indictments or informations which have been approved by [the Missouri Supreme Court] shall be deemed to comply with the requirements of this Rule 23.01(b).'" *State v. Bailey*, 760 S.W.2d 122, 124 (Mo. banc 1988); *State v. Hyler*, 861 S.W.2d 646, 649 (Mo.App. W.D.1993). The State's charges followed word-for-word the applicable MACH–CR approved charges and contained the elements of the charged offenses as set out by statute, and therefore, Mark's claim is without merit. *State v. Dunmore*, 822 S.W.2d 509, 513–14 (Mo.App.W.D. 1991) (addressing the same challenge to the lack of mental element in a charge for assault).

■ Mark next claims that all four counts of the indictment were "duplicitous" because they charged him with acting either "alone or knowingly in concert with another." The charging of a defendant with "either acting alone or in concert with another" does not operate to charge the defendant with two separate offenses and is entirely appropriate. *State v. Carter*, 771 S.W.2d 844, 846 (Mo.App. W.D.1989); *Woods v. State*, 775 S.W.2d 552, 553 (Mo.App. S.D.1989).

■ Mark's final attack on his indictment challenges counts II and IV as being "multiplicitous" because both allege armed criminal action "arising from the same act." He is mistaken. "Each time a dangerous instrument is employed to effectuate certain felonies, the crime of armed criminal action is committed." *State v. Cooper*, 712 S.W.2d 27, 31 (Mo.App. E.D.1986). The counts of armed criminal action arose from separate and distinct underlying crimes and are in no way multiplicitous. *State v. Fitzgerald*, 781 S.W.2d 174, 187 (Mo.App. E.D.1989); *State v. Wallace*, 745 S.W.2d 233, 236 (Mo.App. E.D. 1987). None of Mark's challenges to his indictment have merit.

## VI. RIGHT TO SPEEDY TRIAL

■ In his fifth point, Mark claims that he was denied his right to a speedy trial in violation of the 6th Amendment to the United States Constitution and Article I, § 18(a) of the Missouri Constitution and that the trial court erred in not granting his motion to dismiss on these grounds. Missouri has adopted the method of analysis set forth in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972), for deciding whether a defendant has been deprived of his right to a speedy trial. "This analysis requires the balancing of four factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to speedy trial; and (4) prejudice to the defendant." *State v. Davis*, 903 S.W.2d 930, 936 (Mo.App. W.D.1995).

■ We first consider the length of the delay. He was indicted on October 10, 1993, and did not go to trial until March 13, 1995, seventeen months later. A delay of eight months or longer is presumptively prejudicial[7] and mandates the examination of the

---

7. The term "presumptive prejudice" does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to

other three remaining factors of the balancing test. *Id.* (citing *State v. Farris,* 877 S.W.2d 657, 660 (Mo.App. S.D.1994)).

With regard to the reasons for this delay, Mark filed a motion for change of judge which was granted on November 23, 1993. This delay must be attributed to defendant, leaving a total delay of about fifteen and one-half months.

■ The parties disagree as to the reason for the rest of the delay. The State contends that defendant filed an "avalanche" of motions which account for most, if not all, of the delay. Defendant contends the delay was caused by the State's indecision over whether to pursue the death penalty in the case. We find neither explanation particularly convincing. Even assuming, however, that the State is responsible for the remainder of the delay,[8] nothing in the record indicates the State deliberately intended to hamper the defense. Delays attributable to the State's negligence or overcrowded court dockets are weighed less heavily against the State, and delays for valid reasons are not weighed against the State at all. *State v. Raine,* 829 S.W.2d 506, 512 (Mo.App. W.D.1992). Therefore, at the most, this factor weighs only slightly against the State.

■ The third factor to be considered is the defendant's assertion of his right to speedy trial. While the defendant is not responsible for bringing himself to trial, the failure to assert the right to speedy trial will make it difficult for the defendant to prove that he was denied a speedy trial. *State v. Bolin,* 643 S.W.2d 806, 815 (Mo. banc 1983). Defendant claims to have made multiple informal requests for a speedy trial prior to making his formal motions for trial setting and speedy trial. Nothing in the record indicates that these informal requests were made, but even if they were, a formal request is required to assert the right to speedy trial. *Smith,* 849 S.W.2d at 214; *Davis,* 903 S.W.2d at 936. Defendant first formally asserted his

right to speedy trial approximately ten months after indictment and seven months prior to trial.

*Davis* addressed a similar situation where the defendant failed to assert his right until eleven months after indictment. *Davis* held that while "the majority of the overall delay in bringing appellant to trial is chargeable to the State, it is attenuated by appellant's delay in asserting his right," and thus, this factor could not be weighed for or against either party. *Davis,* 903 S.W.2d at 937.

■ The final and most important factor to be considered in the balancing test is whether the delay actually prejudiced the defendant. *State v. Darnell,* 858 S.W.2d 739, 745 (Mo.App. W.D.1993). In making this determination, we must consider: (1) the prevention of oppressive pretrial incarceration; (2) the minimization of anxiety and concern of the accused; and (3) limitation of the possible impairment of the defense. *Bolin,* 643 S.W.2d at 815 (citing *Barker,* 407 U.S. at 532, 92 S.Ct. at 2193).

Defendant also claims the length of time he was held in prison was oppressive and that being locked up and separated from his family increased his anxiety and concern regarding his case. "Undoubtedly, anxiety and concern exist in every criminal case, but 'that alone does not establish prejudice where, as here, the defendant neither asserts nor shows that the delay weighed particularly heavily on him in specific instances.'" *State v. Ingleright,* 787 S.W.2d 826, 832 (Mo.App. S.D.1990) (quoting *State v. Bolin,* 643 S.W.2d 806, 815 (Mo. banc 1983)).

■ Defendant also contends that his defense was hampered because he was unavailable to defense counsel during the preparation of his case. He fails to explain exactly how or why he was "unavailable" to defense counsel during the preparation of his case or in what way this hurt his defense. To require reversal, the resulting prejudice must

---

trigger the *Barker* inquiry. *State v. Farris,* 877 S.W.2d 657, 659–60 (Mo.App. S.D.1994) (citing *Doggett v. U.S.,* 505 U.S. 647, 652 n. 1, 112 S.Ct. 2686, 2691 n. 1, 120 L.Ed.2d 520 (1992)).

8. Where neither party is able to point to specific acts of the other which caused the delay, the ultimate duty to bring the accused to trial rests with the State. *State v. Smith,* 849 S.W.2d 209, 214 (Mo.App. E.D.1993); *State v. Bolin,* 643 S.W.2d 806, 814 (Mo. banc 1983).

be actual prejudice apparent on the record or by reasonable inference, not speculative or possible prejudice. *Darnell,* 858 S.W.2d at 746; *State v. Edwards,* 750 S.W.2d 438, 442 (Mo. banc 1988). He has failed to establish prejudice and this factor weighs heavily against him.

Having balanced all of the factors set out by *Barker,* we find defendant was not denied his right to speedy trial. Point denied.

## VII. DISCOVERY OF IDENTITY OF GRAND JURORS

■■■ In his sixth point, defendant contends the trial court erred in denying his motion to discover the names and addresses of all persons who served as grand jurors between October 1993 and June 1994 and the names and addresses of all persons serving as grand jurors in Livingston County over the past ten years. He claims this information would have allowed him to successfully challenge the validity of his indictment because of a violation of § 540.045. That section provides that any person who has served as a member or alternate on a grand jury shall not be eligible to serve again for ten years. § 540.045. Defendant claims to have "reason to believe that a grand juror who served during the term of the jury empaneled in 1993 had previously served on a grand jury in 1991." He failed, however, to indicate in his motion for discovery or his appellate brief his basis for this belief. The trial court was certainly within its discretion to treat his request as a "fishing expedition" and deny his motion where the defendant failed to state the reason for his belief that there were irregularities in the grand jury selection process. *Adail v. State,* 612 S.W.2d 6, 7 (Mo.App. E.D.1980). Point denied.

## VIII. SEARCH WARRANT

■■■ Mark next contends that the search warrant authorizing the seizure of Claude Woodworth's pistol was not supported by probable cause and that the trial court erred in denying his motion to quash that warrant. Search warrants may only issue upon an adequate showing of probable cause. U.S. Const. amend. IV; Mo. Const. art. I § 15. "Probable cause necessary to issue a search warrant is determined by the 'totality of the facts and circumstances alleged in the application for the warrant and its accompanying affidavit.'" *State v. Keller,* 870 S.W.2d 255, 259 (Mo.App. W.D.1994) (quoting *State v. Hodges,* 705 S.W.2d 585, 588 (Mo.App.S.D. 1986)). The Fourth Amendment requires only that there be a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Id.* (citing *Illinois v. Gates,* 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983)). Great deference is afforded a judicial officer's determination of probable cause, and the trial court's finding will only be reversed upon a clear showing of abuse of discretion and clear error. *Id.* at 258.

The affidavit submitted in support of the application for the search warrant contained the following information: (1) the Robertsons, who lived across the street from the Woodworths were shot while sleeping in their bedroom; (2) the bullet fragments recovered in the bedroom were .22–caliber bullets that had been gold-coated; (3) on the night of the shooting, someone entered the Robertson's machine shed and took some .22–caliber gold-coated bullets; (4) Mark told investigators that he was not aware of any ammunition in the machine shed and that there was "no way" his fingerprints would be found in the shed; (5) the pistol in question had previously been given to police by Claude Woodworth for ballistics tests; (6) those ballistic tests indicated that the pistol could have fired the bullets; and (7) Mark's fingerprints were matched to the thumbprint found on the ammunition box. The affidavit contained sufficient facts to establish probable cause. Point denied.

## IX. VIOLATIONS OF JUVENILE CODE

■■■ In his next point Mark contends the trial court erred in not suppressing statements he made to law enforcement officers because the statements were not elicited in accordance with Chapter 211, RSMo (the State Juvenile Code), thereby violating the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article 1, Sections 10, 15, 18(a), and 19 of the Missouri Constitution. Specifically,

he contends the statements he made on July 4, 1992, and April 11, 1993, to Chief Deputy Gary Calvert and Terry Deister were not taken in accordance with the procedures set forth in the Juvenile Code and should have been suppressed.

Mark alleges violations of numerous provisions of the Juvenile Code, including §§ 211.059, 211.061, 211.141, and 211.271(3), and several Missouri Supreme Court Rules, including Rules 111.02, 111.04, 116.01, and 122.05. None of the referenced statutes or rules are applicable to the case at bar, however. Mark was neither a "child" nor a "juvenile," as those terms are defined in the Juvenile Code or applicable Rules.

The Juvenile Code exists for the benefit of children, see § 211.011,[9] and defines a "child" as "a person under seventeen years of age." § 211.021(2). In some contexts, a "child" can also mean a person between the ages of seventeen and twenty-one over whom the juvenile court retains jurisdiction. § 211.041. The Missouri Supreme Court Rules applicable to the Juvenile Courts substitute the term "juvenile" for "child," and define a "juvenile" as "a person under twenty-one years of age who is subject to the jurisdiction of the juvenile court." Rule 110.05(a)(10).[10]

Mark was born on August 5, 1974. At the time of the initial interrogation on July 4, 1992, he was one month short of his eighteenth birthday. There is no dispute that he was over seventeen years of age when he was first questioned by Deputy Calvert. He contends, however, the Juvenile Code and Rules apply because he was a "juvenile" as the term is defined in Rule 110.05(a)(10).

As stated, *supra*, a "juvenile" is "a person under twenty-one years of age who is subject to the jurisdiction of the juvenile court." Rule 110.05(a)(10). Mark relies on Rule 111.01(c) which states, "[t]he jurisdiction of the [juvenile] court attaches from the time the juvenile is taken into judicial custody." Rule 111.01(c). He argues he was taken into custody on July 4, 1992, thereby subjecting him to the jurisdiction of the juvenile court and invoking the protections of the Juvenile Code and Rules. His argument is flawed, however, because he fails to acknowledge the significance of the defined term "judicial custody" contained in Rule 111.01(c). " 'Judicial custody' means the taking or retention of custody of the person of a juvenile in either protective custody or detention[.]" Rule 110.05(a)(9) (emphasis added). The Rules define "detention" as "the taking or retention of the person of a juvenile in judicial custody in connection with proceedings under subdivision (2) or (3) of subsection 1 of section 211.031 RSMo[.]" Rule 110.05(a)(6).[11]

On July 4, 1992, Mark consented to go with Deputy Calvert to the police station to answer questions. When the session was finished, he returned home. The same occurred on April 11, 1993. On neither occasion was the juvenile court's jurisdiction invoked by the filing of a petition with the court pursuant to § 211.031.1(3). Moreover, absent such a proceeding, Mark cannot be considered to be in "detention" as that term is defined. Under these facts, Mark was not in "judicial custody" on either July 4, 1992, or April 11, 1993, and was not subject to the jurisdiction of the juvenile court. As a result, contrary to his contention, he was not a

**9.** Section 211.011 states that "[t]he purpose of [the juvenile code] is to facilitate the care, protection and discipline of children who come within the jurisdiction of the juvenile court."

**10.** The Comment to Rule 110.05 explains the reason the term "juvenile" is used and the term "child" is not defined in the Rules. "While the Juvenile Code employs the term "child" defining it in Section 211.021(2) to mean a person under seventeen years of age, the term itself is not consistently so used in the Juvenile Code; in many instances it also necessarily includes a person over the age of seventeen years. The definition of "juvenile" is used consistently in these Rules." Rule 110.05, Comment.

**11.** Section 211.031 provides, in pertinent part:

1. Except as otherwise provided in this chapter, the juvenile court ... shall have exclusive original jurisdiction in proceedings:

(3) Involving any child who is alleged to have violated a state law or municipal ordinance, or any person who is alleged to have violated a state law or municipal ordinance prior to attaining the age of seventeen years, in which cases jurisdiction may be taken by the court of the circuit in which the child or person resides or may be found or in which the violation is alleged to have occurred....

"juvenile" in the context of the Juvenile Code or Rules. Point denied.

## X. CERTIFICATION AS ADULT

In his ninth point Mark argues that the trial court and juvenile court erred in allowing him to be tried as an adult. "Appellate review of a juvenile court's decision to terminate jurisdiction as to a youthful offender is limited to a determination of whether in the totality of circumstances the court abused its discretion." *In re Interest of A.D.R.*, 603 S.W.2d 575, 580–81 (Mo. banc 1980). Section 211.071 governs the dismissal of juvenile proceedings to allow prosecution under the general law. § 211.071. That section lists ten non-exclusive factors "which shall be considered by the court in determining whether the child is a proper subject to be dealt with" by the juvenile justice system:

(1) The seriousness of the offense alleged and whether the protection of the community requires transfer to the court of general jurisdiction;

(2) Whether the offense alleged involved viciousness, force and violence;

(3) Whether the offense alleged was against persons or property . . .

(4) Whether the offense alleged is part of a repetitive pattern of offenses . . .

(5) The record and history of the child . . .

(6) The sophistication and maturity of the child . . .

(7) The age of the child;

(8) The program and facilities available to the juvenile court in considering disposition;

(9) Whether or not the child can benefit from the treatment or rehabilitative programs available to the juvenile courts; and

(10) Racial disparity in certification.

§ 211.071(6). The certifying court need not give equal weight to each of the listed factors, nor is it required to make an express finding on each one. *State v. Seidel*, 764 S.W.2d 517, 518 (Mo.App.1989); *State v. Garbe*, 740 S.W.2d 266, 268 (Mo.App.1987).

After the hearing, the court stated that it had considered all of the factors mandated by statute. In rendering its judgment, the juvenile court expressly based its decision on the violent nature of the alleged offense, the current age of the defendant (19), and the inability of the court to commit the defendant to the Division of Youth Services. Further bolstering the juvenile court's decision, and obvious from the record, Mark was almost seventeen at the time of the crime, and the offense charged involved serious injuries to persons. Given these factors, the juvenile court was well within its discretion in certifying Mark for trial as an adult. *State v. Simpson*, 836 S.W.2d 75, 82–83 (Mo.App. S.D.1992). *See also, Seidel*, 764 S.W.2d at 519; *Garbe*, 740 S.W.2d at 268.

Mark further argues in point nine that the certification process itself is fatally flawed in violation of Article 2, § 1 and Article 1, §§ 2, 10, and 14 of the Missouri Constitution, in addition to the Fifth and Fourteenth Amendments to the United States Constitution. He claims that because the juvenile officer is appointed by the juvenile court judge, the certification procedure creates a direct conflict of interest and violates the separation of powers. He fails to develop this argument or to cite to any authority, outside of the Constitutional provisions themselves, to support his contention. "Where a party fails to support a contention with relevant authority or argument beyond conclusions, the point is considered abandoned." *Beatty v. State Tax Comm'n*, 912 S.W.2d 492, 498–99 (Mo. banc 1995) (citing *Thummel v. King*, 570 S.W.2d 679, 687 (Mo. banc 1978)).

## XI. ADMISSION OF EXPERT BALLISTICS TESTIMONY

In his tenth point, Mark claims the trial court erred in allowing the State's firearms experts to testify regarding the ballistics tests conducted on the bullets and Claude Woodworth's gun and on the general manufacture of firearms. He argues that, because the witnesses did not personally conduct any tests or experiments on the manufacturing process or specifically observe the manufacture of Claude Woodworth's pistol, their opinions were speculative and based on hearsay.

"The admission of expert testimony is within the sound discretion of the trial

court, and the trial court abuses that discretion only when its ruling is clearly against the logic of the circumstances or is arbitrary and unreasonable." *State v. Hendrix,* 883 S.W.2d 935, 938 (Mo.App. W.D.1994). An expert witness is entitled to rely on hearsay evidence to support an opinion so long as that evidence is of the type reasonably relied upon by other experts in that field, and such evidence need not be independently admissible. *State v. Rowe,* 838 S.W.2d 103, 110 (Mo.App. E.D.1992). "Any expert witness represents the distillation of the total of his personal experiences, readings, studies and learning in his field of expertise, and he may rely on that background, hearsay or not, as basis for his opinion." *State v. McFall,* 737 S.W.2d 748, 755 (Mo.App. S.D.1987).

The three witnesses were established as qualified firearms experts without challenge from defendant. With regard to the testimony he now attacks, all three experts had extensively studied the field of firearms and were familiar with books and studies on the general manufacture of firearms. Experts Garrison and Clayton testified that they had personally observed the manufacturing process at various arms factories over the course of their careers.

The trial court did not abuse its discretion in allowing these arms experts to offer their opinions on the manufacturing process and the likelihood that Claude Woodworth's pistol fired the recovered bullets. Point denied.

## XII. PROSECUTORIAL MISCONDUCT

■ For his eleventh point, defendant argues that the trial court erred in denying his motion for new trial because "the prosecutor engaged in blatant misconduct throughout the entire trial." He alleges the prosecutor made several arguments and comments calculated to inflame the jury.

The first alleged instance of misconduct arises from the following exchange:

Q: [Prosecutor]: You don't remember telling Gary Calvert that you must have been wrong?

A: [Witness Rouff]: No, I never said that.

Q: What did you say, sir?

A: I said you may think I didn't see anything, but I'd bet a million dollars I did.

[Prosecutor]: I'm not sure I'd make that bet Mr. Rouff.

Defense counsel then moved to have the prosecutor's comment stricken from the record. The court sustained this motion. No further relief was requested by defendant. When the court grants the relief sought by a defendant, nothing is preserved for appellate review. *State v. Olivares,* 868 S.W.2d 122, 130 (Mo.App. W.D.1993). The adequacy of the action taken by the trial court is assumed, and if mistrial is warranted, defense counsel bears the burden of requesting such relief. *Id.* (citing *State v. White,* 782 S.W.2d 461, 465 (Mo.App. W.D.1990) ).

■ The next alleged instances of prosecutorial misconduct relate to closing argument. Defendant claims the prosecution was inappropriately allowed to inflame the passions of the jury through the statement wrapping up his argument:

Ladies and gentlemen, we know the responsibility we're asking you to undertake, and we know the difficulty of looking at a young man and his family and having to do the right thing. But when Rhonda Robertson was cradling her father and rocking him back and forth, she wondered if someday their family would receive some measure of justice and right now you are it.

Defendant claims this characterization of Rhonda Robertson was inappropriate because testimony to this effect was not given at trial.

■ The trial court is afforded broad discretion in controlling the arguments of counsel and may allow counsel wide latitude in their summations. *State v. Stuckey,* 680 S.W.2d 931, 937 (Mo. banc 1984). "The ruling of the trial court will be reversed only for an abuse of discretion which is prejudicial to the accused." *State v. Corpier,* 793 S.W.2d 430, 442 (Mo.App. W.D.1990). Defendant has failed to establish that the comments were prejudicial to him.

Defendant also challenges three actions by the prosecutor during voir dire. The trial court has broad discretion over the nature and extent of voir dire, and its decisions will

not be disturbed absent a clear abuse of that discretion. *State v. Roe*, 845 S.W.2d 601, 605 (Mo.App. E.D.1992).

He first claims prejudicial misconduct during voir dire because the prosecutor, after being asked by a juror, told the jury that they would not have a copy of the trial transcript during deliberations because one would not have been prepared by then. He fails to develop any argument or to cite to any authority which might explain his complaint about this behavior. He also fails to indicate how this behavior could have been prejudicial to him. Point denied.

▪ Next, defendant finds fault with the prosecution's effort to give the jury a "real rough example" of the use of circumstantial evidence, wherein the prosecutor stated:

There aren't any windows in here. Let's assume ... we hear some rumbling, the lights kind of flicker, we hear something that sounds like lightening crashing. When you go out ... you see droplets of water on the hood of your car ... and you see clouds in the sky ... [I]t's a pretty reasonable inference to say, while we were inside ... it rained.... [T]hat's what's called circumstantial evidence. Is there anybody who feels that's something they could not consider ... during your deliberations?

▪ Defendant correctly notes that this explanation is not part of the Missouri Approved Instructions for Criminal Cases, however, we do not agree with his contention that these comments could have had a decisive effect on the jury's decision. Moreover, counsel is allowed to discuss a legal concept like "circumstantial evidence" with the jury so long as that discussion stops short of defining the term. *State v. Dunn*, 889 S.W.2d 65, 71 (Mo.App. E.D.1994). The prosecution's comments fell well within these parameters.

▪ Defendant finally asserts prosecutorial misconduct during voir dire when the prosecutor commented:

The definition of reasonable doubt will be given to you by the court, but it does not require proof that overcomes every possible doubt. It's a doubt based upon reason and common sense after careful consideration of all the evidence.

No objection was made to these comments during voir dire.

These comments are substantially consistent with MAI–CR 3d 302.04, the instruction given by the trial court. "Remarks which do not transgress the confines of the court's instructions are not objectionable." *State v. Troupe*, 863 S.W.2d 633, 636 (Mo.App. E.D. 1993). Furthermore, any imprecision in the prosecutor's voir dire was adequately addressed and cured by the jury instruction on "reasonable doubt." *State v. Storey*, 901 S.W.2d 886, 893 (Mo. banc 1995). Point denied.

## XIII. INSTRUCTIONAL ERROR

▪ In his final point, Defendant asserts six different instructional errors. He first claims instructional error because the indictment said he acted alone *or knowingly in concert with another*. He claims that because the instructions submitted to the jury did not contain the "in concert with another" language, the instructions fatally varied from the indictment.

▪ The assertion is without merit. An indictment may charge the defendant as a principal or as an accomplice with the same legal effect, and therefore, it is proper to submit a theory to the jury of accomplice liability despite charging the defendant as a principal, and vice versa. *State v. Isa*, 850 S.W.2d 876, 898 (Mo. banc 1993); *State v. Coleman*, 660 S.W.2d 201, 217–18 (Mo.App. W.D.1983).

▪ Defendant next claims error because the trial court's instructions on the armed criminal action counts did not require the jury to make a finding as to the defendant's specific intent to commit that crime. The instructions given faithfully tracked MAI–CR 3d 332.02.1, the pattern instruction for that offense. When an applicable MAI–CR instruction is available, that instruction must be given by the trial court as written, and its use will not constitute error. *State v. Smith*, 891 S.W.2d 461, 469 (Mo.App. W.D.1994).

■ Third, defendant claims the trial court erred in failing to include jury instructions for the lesser-included offenses of third degree assault, second degree assault, involuntary manslaughter, and trespass. He asserts that the State's failure to prove "who was shot first, whether Lyndel Robertson was moving around, threatening to shoot him, or whether the shooting occurred after an argument" established an evidentiary basis for those instructions. He argues that the victims "might have been shot accidentally, and/or unintentionally, in self defense, or in the heat of sudden passion."

■ A trial court is not obligated to give the jury an instruction for an included offense "unless there is a basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." *State v. Mease,* 842 S.W.2d 98, 112 (Mo. banc 1992) (citing § 556.046.2). This basis must be more than mere possibility and speculation. *State v. Robinson,* 825 S.W.2d 877, 882 (Mo.App. W.D.1992). Defendant gives no reason why a trespass in the first degree instruction should have been given. With regard to the other lesser offenses, he has failed to show any evidentiary basis which would support a conviction for any of the requested lesser offenses in the event of an acquittal for the greater offense. His contentions are mere speculation. Furthermore, the testimony of Lyndel Robertson sufficiently established that both he and his wife were asleep when they were shot. No reasonable jury could have concluded, or even considered, that this act was accidental, unintentional, self-defense, or in the heat of passion. The trial court did not err in withholding these instructions from the jury.

■ Defendant next attacks the trial court's refusal to submit his circumstantial evidence instruction modeled after a repealed version of MAI–CR 3d 310.02. The pertinent part of that instruction was withdrawn by the Missouri Supreme Court in *State v. Grim,* 854 S.W.2d 403, 407–408 (Mo. banc 1993). He argues that, because the Robertsons were attacked prior to *Grim,* the repealed instruction should have been available to him and that its denial violated his right to be free from *ex post facto* laws. In repealing MAI–CR 3d 310.02, *Grim* held that instruction incorrectly stated the law and functioned to confuse and mislead jurors. *Id.* The trial court did not err in refusing to give this instruction.

His fifth challenge to the trial court's instructions asserts that the "firmly convinced" language of MAI–CR 3d 302.04, the reasonable doubt instruction, is unconstitutional. This claim is wholly without merit. *State v. Storey,* 901 S.W.2d 886, 897 (Mo. banc 1995); *Silvey,* 894 S.W.2d at 673; *State v. Harris,* 870 S.W.2d 798, 811 (Mo. banc 1994), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

■ Defendant finally asserts that the trial court erred "in giving Instructions article and 22(sic) in that these instructions submitted both an attempt to kill or cause serious physical injury to Lyndel Robertson." He apparently alleges error in not defining the term "attempt" in conjunction with the instructions on first degree assault and first degree burglary.

The trial court's instruction on first degree assault faithfully followed MAI–CR 3d 319.06, which does not define the term "attempt." *State v. Moore,* 882 S.W.2d 253, 262 (Mo.App. E.D.1994) (rejecting identical argument for "attempt" definition in conjunction with MAI–CR 3d 319.06) (citing *State v. Wade,* 815 S.W.2d 489, 491 (Mo.App. S.D. 1991) (rejecting argument that "defraud" should be defined in forgery instruction)). His final point is denied.

For the reasons expressed in Point III above, the judgment is reversed and the case is remanded for a new trial due to error in failing to admit evidence of prior inconsistent statements of Mr. Robertson as substantive evidence and the consequent erroneous exclusion of evidence that Mr. Thomure had motive and opportunity to commit the crimes. We reject the other claims of error made by defendant.

All concur.